IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 12, 2008 Session

**EARICE ROBERTS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 02-03222     Chris Craft, Judge**

_____

**No. W2008-00573-CCA-R3-CO  - Filed February 4, 2009**
_____

The petitioner, Earice Roberts, appeals the denial of his petition for writ of error coram nobis, arguing that the trial court should have granted him relief on the basis of newly discovered evidence that a police officer and witness for the State had committed crimes in her official capacity as manager of the evidence and property room.  Following our review, we affirm the order of the trial court denying the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

James P. DeRossitt, IV, Memphis, Tennessee, for the appellant, Earice Roberts.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Chris West, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On August 13, 2003, the petitioner was convicted by a Shelby County jury of possession of heroin with intent to sell, a Class B felony; possession of heroin with intent to deliver, a Class B felony; possession of marijuana, a Class A misdemeanor; and two counts of assault, Class A misdemeanors.  After a sentencing hearing, the trial court merged the two heroin convictions and sentenced the petitioner to twelve years as a Range I offender.  The trial court also sentenced the petitioner to eleven months and twenty-nine days on each of the misdemeanor convictions with the sentence for the marijuana conviction to be served concurrently with the sentence for the heroin conviction and the sentences for the assault convictions to be served consecutively with each other and with the sentence for the heroin conviction.  The total effective sentence imposed was thirteen

years, eleven months, and twenty-nine days. On direct appeal, this court affirmed the petitioner's convictions but modified his sentence on the heroin conviction to ten years, six months based on the United States Supreme Court's ruling in Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004); thereafter, the Tennessee Supreme Court denied permission to appeal. See State v. Earice Roberts, No. W2003-02668-CCA-R3-CD, 2004 WL 2715316, at *1 (Tenn. Crim. App. Nov. 23, 2004), perm. to appeal denied (Tenn. Mar. 21, 2005).

The evidence supporting the petitioner's convictions was summarized by this court on direct appeal as follows:

Viewed in the light most favorable to the State, the evidence established that between 7:30 and 8:00 a.m. on July 20, 2001, Memphis Police Officers Kittrel Robinson and Therman Richardson were patrolling undercover in an unmarked unit in the 2200 block of Eldridge Street, an area commonly known as "the dope track," when they were flagged down by the [petitioner]. Robinson indicated he wanted to buy marijuana, and the [petitioner] handed Richardson two plastic bags of marijuana through the open passenger window. However, before the officers could give him the $10 payment, the [petitioner] took off running, apparently having been alerted that something was amiss when Robinson cracked his car door open upon receipt of the drug. Both officers pursued on foot, identifying themselves as police officers and calling out to the [petitioner] to stop, before tackling him in the driveway of a house thirty to forty feet away. There, the officers struggled with the [petitioner] for five to seven minutes, incurring scrapes and bruises in the process, before backup officers arrived and they were finally able to handcuff him. Another bag of marijuana; $222 in cash, including two one dollar bills folded up with a white powder; and several aluminum foil packages containing a white powdery substance were found in the [petitioner]'s pockets after his arrest.

Officer Robinson testified he and his partner took the drugs seized from the [petitioner] to the secure property and evidence room in the basement of the jail, where the drugs were field-tested, sealed in plastic bags, placed in a brown evidence envelope, labeled, and assigned a property receipt number. After referring to the arrest ticket, he testified the drugs were assigned the number "010701183." Robinson identified the evidence envelope in which the drugs had been placed, and testified for the record that both ends of the envelope were sealed when he examined it in court. On cross-examination, he testified he was present when the property room personnel opened each aluminum packet to determine if all contained the same substance and when a field test was performed on the contents of one of the aluminum packets. He said all of the packets appeared to contain the same white powder and that the powder turned blue upon testing, which indicated it was positive for cocaine. On redirect, he testified that the field test performed was known by the name "Scott," but that he was not a chemist, was unfamiliar with the drugs used in

-2-

the testing process, and knew only from what he had been told that a color change to blue indicated the presence of cocaine.

Officer Therman Richardson testified he witnessed the "Scott test" performed on the white powdery substance and confirmed that the color changed to blue, which indicated a positive for cocaine. Richardson acknowledged, however, that neither he nor the individual who performed the test was a chemist. He identified his handwriting on the property receipt form and explained the procedure he followed in submitting the evidence:

> Q. Okay. After that, you said you tagged the evidence. Tell the jury what tagging the evidence means. How do you do it?
>
> A. Just merely -- there's a plastic bag that the actual drugs goes [sic] into and the person that tested it, they will sign their name and IBM Number to it. Me, after witness it being positive, I will sign my name and IBM to it. It is then placed inside a yellow property and evidence receipt. On that particular day, I did fill out and -- the appropriate box that went with this particular case. And it's left there at the property and evidence room assigned a number.

Richardson testified he witnessed the drugs being placed in the yellow evidence envelope. He identified the envelope in court by his handwriting and by the identification number assigned to the case.

Memphis Police Officer Laquita Jones, who said she was assigned to the Vice Narcotics Unit, testified that her duties included transporting drugs from the property and evidence room to the Tennessee Bureau of Investigation ("TBI") laboratory for testing and back to the evidence room upon completion of the testing process. She described the procedure she followed when picking up drugs for transport to the TBI laboratory:

> Q. How do you insure that the drugs you take out of the property room are the drugs you're supposed to take over to TBI?
>
> A. Well, it's all -- TBI requires me on the packaging, I have to put it in a plastic bag to take to TBI. I am supposed to describe whatever substance I think it may be that I'm bringing to them. It has to be on the outside of the package, and I also have to write it down in a form and let them know what I think it may be. That it is a substance, but I have to let them know that I'm bringing them something. What color it is. What shape or form it may be. So they won't just get a blank bag and not know what's going on. They could get a bag that's

empty. I have to look at the substance to make sure that I am actually taking them something.

Jones stated that her procedure involved taking the drugs out of the yellow or gold evidence envelope, but leaving them sealed inside the clear plastic bag. She said that if the drugs in the plastic bag were wrapped or inside a container, she would partially open one of the containers to insure that it contained a substance and to briefly describe its appearance. She made it clear, however, that her unwrapping or opening of any container holding the drugs occurred through the sealed plastic bag:

Q. And when you look at the substance, do you actually open it up and touch it?

A. I -- it's sealed in a plastic bag. I take it out of the envelope. I do not open the plastic bag. I look at it through the plastic baggy. If it's wrapped or contained in something, again, I don't open the plastic bag. I kind of open whatever container it is, and I will open only one of them to make sure that it's a substance in there and briefly describe on the packaging what I assume it to be.

Jones went on to detail the next steps in her procedure:

Q. Okay. So you've got suspected drugs that are sealed in . . . a plastic envelope -- And . . . those plastic envelopes and that drug sealed inside them are contained in a --

A. Gold envelope.

Q. A gold envelope. And then you take that gold envelope and the contents of that gold envelope after you have examined them and put them in a separate envelope?

A. Yeah. I put them in a separate plastic bag and seal that bag.

Q. Is that bag colored or is it clear?

A. It's a clear bag. It's clear and on one side it's going to have a little square shape that says, right side. For the most part, it's clear.

Q. And how do you seal it?

A. I take it -- first of all, I have to write, like I said, a brief description of whatever the substance is that's contained in the envelope. I take

evidence tape and it's already sealed at the bottom. It's open at the top. I take evidence tape and I fold it over on all sides where you can't get into it, and I write my initials on it saying that I sealed this bag. I did it. And I'm transporting it to the TBI.

Jones stated that the TBI laboratory staff acknowledged taking possession of evidence from her by returning a signed or initialed receipt upon her transfer to them of the sealed evidence envelopes.

Jones testified she followed the same procedure outlined above with the evidence in this case, which she identified in court by her signature and the date and time she had written across the bar code on the back of the yellow envelope. She, additionally, identified her initials on the outside of the two plastic bags within the yellow evidence envelope and testified she had described the contents of the first bag as follows: "Number 1, plastic bag containing a baggy with several pieces of yellowish rock like substances suspected to be crack cocaine. All individually wrapped in foil." Jones affirmed, however, that she never opened either of the two sealed plastic bags containing the suspected drugs and said her written description was based only on her estimation of what the contents might be. She testified on cross-examination that she had torn "a little piece" of the aluminum foil on one of the packets in order to see the contents, which appeared to her to be either "yellowish" or "light brownish." Her description of the contents as "rock like" was based on what she could feel of the drug through the aluminum foil packaging.

TBI Special Agent Forensic Scientist Dana Rose, who was accepted by the court as an expert in forensic science, testified that when a case is brought into the TBI laboratory for testing, the evidence envelope is first checked to insure it has arrived in a sealed condition; the case information is then entered into the TBI computer, which generates a unique laboratory number that is recorded on the packaging; and finally, a chemist is assigned to work the case. She said the chemist receives the evidence from the forensic technician, who, in turn, retrieves it from the vault.

Rose testified that she must obtain positive results from at least two tests, a color change test, sometimes known as a "field test kit," and an instrumental analysis, before concluding that a substance has tested positive for a scheduled drug. She stated that the instrumental analysis is the more reliable of the two, as the color change test is merely a "presumptive test," meaning that substances besides the one for which the test was designed can yield a positive result. She explained that the purpose of the presumptive test is to indicate which direction to take for further testing of the drug, as in which instrumental analysis to use. She was unaware of a "Scott" field test, but was familiar with a field test in which the chemicals turn blue to indicate a positive for cocaine, known as the "Cobalt Thiocyanate test." Rose

-5-

testified that heroin would result in a blue color change or positive result in a Cobalt Thiocyanate test because "[c]obalt will turn blue in any substance that is in the hydrochloride form and cocaine is in the hydrochloride form and so is heroin."

Rose identified the evidence envelope in which the drugs in this case arrived to her for testing by several different identifying characteristics, including: the laboratory number; the [petitioner]'s name; the date the evidence was brought into the laboratory; the name of the person who brought the evidence into the laboratory; and the seal, containing her initials and the date she had worked the case, which she had placed across the bottom of the envelope upon completion of her work. The envelope was sealed when she received it, and she removed the drugs by opening it from the opposite end from the one at which the officer had placed his or her seal. When her work was completed, she replaced the drugs, sealed the end she had opened, and returned the envelope to the evidence vault.

Rose testified that her laboratory tests revealed that the sample she labeled as exhibit one, which she referred to the official laboratory report as a "[t]an powder," consisted of 0.6 grams of heroin, and that the second sample, referred to as "plant material," consisted of 4.8 grams of marijuana. Because she worked only one case at a time, there was no possibility of cross-contamination from another case. On cross-examination, she testified that tan, to her, was any color ranging from off-white to light brown and included "yellowish."

At the conclusion of Rose's testimony, the [petitioner] moved to strike the drug evidence for failure to establish a proper chain of custody, based on the conflicting testimony about the nature and characteristics of the substance contained in the foil packets. The trial court overruled the motion, finding that the chain of custody was sufficiently established through the testimony of the various individuals in the chain:

> Well, what I have proof of is that the officers who recovered the substances from the [petitioner] took them to the property room and sealed them. And then I have a witness who picked up the property still sealed, took it to the TBI Lab. The TBI Lab person testified that the property was sealed. They opened it and tested it, sealed it back. There was a witness that said they received it in a sealed condition and brought it back to the property room sealed. And then it was sealed when it was brought into court and unsealed here. So I don't see any proof of possibility of tampering.
>
> Now, we have not opened these exhibits to look at the color of the powder in the aluminum foil. And I'm sure if that argument is going to be made by the Defense, at some point that's going to be

done. But as of right now, I can't see that the chain of custody hasn't been shown.

The State's final witness was Alnita Campbell, the supervisor of the Property and Evidence Division of the Memphis Police Department, who testified her records showed the following property tagged on July 20, 2001, under "Number 010701183": "2.6 grams total gross weight of crack cocaine, 8 grams total gross weight of marijuana," and $222 in cash. She said gross weight included the weight of the drugs and the packaging, and a substance's having been tagged as "crack cocaine" meant only that it had tested positive for cocaine by turning blue in the "Scott test."

The [petitioner] elected not to testify and presented no evidence in his defense.

Earice Roberts, 2004 WL 2715316, at *1-5.

The petitioner filed a timely petition for post-conviction relief, and during preparation for the hearing, his attorney discovered that one of the grounds in the petition needed to be handled by way of a petition for writ of error coram nobis. Therefore, on January 31, 2007, the petitioner filed a petition for writ of error coram nobis, and the State filed its response on March 21, 2007. The trial court heard the matter on May 4, 2007.

At the error coram nobis hearing, the State and defense stipulated that Alnita Campbell was indicted in federal court on December 17, 2003, for "Conspiracy to Commit Theft from Program Receiving Federal Funds and Theft from a Program Receiving Federal Funds," and she pled guilty to the offenses on October 18, 2004. The petitioner testified that his petition was not filed on an earlier date because he did not find out about Alnita Campbell's convictions until late 2006 or January 2007, which was a few years after he was convicted. The petitioner said that he would have pursued all avenues of available relief had he known a witness at his trial had been engaged in criminal activity. On cross-examination, the petitioner testified that in December 2003 he was either incarcerated in the Shelby County Jail or "West High" in Henning, Tennessee, before being transferred to Whiteville Correction Center three to seven months later. He admitted he had access to a library with books and newspapers at Whiteville Correction Center.

The court denied the petition for writ of error coram nobis on February 5, 2008, and the petitioner then filed a timely notice of appeal.

## ANALYSIS

On appeal, the petitioner argues that the court erred in denying coram nobis relief because newly discovered evidence concerning the criminal activity of Alnita Campbell, one of the State's witnesses, would have likely resulted in a different verdict at his trial. He asserts that the chain of custody of the heroin evidence used to convict him was a central issue at trial, and he should have

had the opportunity to impeach Campbell "about her activities as property and evidence room supervisor." The State responds that the petitioner's claim was filed outside the statute of limitations and, in the alternative, that the newly discovered evidence would have had no effect on the jury's verdict.

## Statute of Limitations

In response to the petitioner's petition for writ of error coram nobis, the State raised the defense that the petition was filed outside the one-year statute of limitations. The court determined that the petitioner raised the claim in his petition for post-conviction relief on June 15, 2005, which was within one year from the date the Tennessee Supreme Court denied permission to appeal and also noted that due process may toll the statute of limitations. The State asserts that the trial court's conclusion was "erroneous[]" in light of our supreme court's decision in State v. Mixon, 983 S.W.2d 661 (Tenn. 1999), in which the court rejected the argument that the statute did not begin to run until the conclusion of the appeal as of right. Id. at 671. The State also asserts that due process does not require tolling of the statute of limitations in this case as discussed in Workman v. State, 41 S.W.3d 100 (Tenn. 2001), because "the petitioner had access to the pertinent information and ample opportunity to litigate the issue before the statute of limitations ran."

We agree with the State that in light of Mixon, the petitioner's claim was not raised in a timely fashion. However, contrary to the State's argument, we conclude that due process requires tolling of the statute of limitations because it is rather unrealistic to assume that the petitioner, while incarcerated, should have discovered news of Campbell's indictments and convictions at an earlier date. As such, we will address the petitioner's issue on the merits.

## Writ of Error Coram Nobis

As noted previously above, the petitioner argues that a "fiercely contested issue" at his trial was the chain of custody of the heroin evidence used to convict him. He asserts that he was convicted, "in part based upon the testimony of Alnita Campbell, the Property and Evidence Room Supervisor in charge of safeguarding the evidence used against [him]." According to the petitioner, Campbell's credibility would have been called into question had he "been able to cross-examine [her] concerning her criminal activity committed in the course of her employment."

A writ of error coram nobis is an extraordinary remedy by which the trial court may provide relief from a judgment under only narrow and limited circumstances. Mixon, 983 S.W.2d at 666. The remedy is available by statute to a criminal defendant in Tennessee. See Tenn. Code Ann. § 40-26-105 (2006). That statute provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated

at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Id. Our supreme court explained in State v. Vasques, 221 S.W.3d 514 (Tenn. 2007), that the trial judge in a coram nobis proceeding must (1) "consider the newly discovered evidence and be 'reasonably well satisfied' with its veracity," (2) determine if the defendant is "'without fault' in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information," and (3) "consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may have* led to a different result." Id. at 527. The decision to grant or deny a petition for writ of error coram nobis based on newly discovered evidence lies within the sound discretion of the trial court. See Tenn. Code Ann. § 40-26-105; State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). We review this issue, therefore, under an abuse of discretion standard.

In its findings, the trial court first stated that there was "no question" as to the veracity of the newly discovered evidence and that the defense was without fault in not presenting the evidence at trial. However, the court then noted that Campbell "testified as to property room records only, as she had nothing to do in person with the petitioner's case" and determined that Campbell's "testimony contributed very little, if anything, to the verdict of guilty[.]" In denying the petition, the court stated, in pertinent, as follows:

[T]he evidence of the petitioner's guilt at trial was overwhelming. The testimony of the officers and the forensic chemist were very credible. Ms. Campbell was only called to testify to records kept at the property room after the chain of custody had already been established and ruled on as sufficient by this court after the testimony of the police officers, the transporting officer and the forensic scientist. She was called merely to eliminate confusion regarding the cash found on the petitioner when arrested. If the investigation or indictment of Ms. Campbell had been known at the time of trial, it would simply have resulted in the State's not calling any additional witnesses concerning property room records, or having called another property room supervisor to testify to the records . . . . [Campbell] was never a "fact" witness in the case, only a keeper of the records for purposes of satisfying the public records exception to the hearsay rule . . . . Any number of persons could have testified to these records. This "newly discovered" impeachment evidence as to Ms. Campbell would have had no effect at all on the verdict in the petitioner's trial[.]

We discern no abuse of discretion on the part of the trial court in denying the petition. We agree with the trial court that the newly discovered impeachment evidence would not have changed the outcome of the trial.

## **CONCLUSION**

Based on our review of the record, the parties' briefs, and the applicable law, we conclude that the trial court did not abuse its discretion in denying the petition for writ of error coram nobis. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE